United States District Court
Southern District of Texas
**ENTERED**
September 17, 2019
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| JENNIFER FILLMORE, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-18-1050 |
| | § | |
| NAN YA PLASTICS CORPORATION, U.S.A., | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is a motion for summary judgment filed by defendant Nan Ya Plastics Corporation, U.S.A. ("Nan Ya"). Dkt. 17. After reviewing the motion, response, reply, record evidence, and the applicable law, the court is of the opinion that the motion for summary judgment should be GRANTED.

## I. BACKGROUND

This claim relates to alleged sexual harassment and retaliation. The plaintiff, Jennifer Fillmore, worked in Nan Ya's human resources department as a personnel assistant from August 2016 through June 2017. Dkts. 17, 18. John Iturburo was her supervisor until his employment was terminated on June 28, 2017, for unprofessional conduct. Dkts. 17, 18; Dkt. 17, Ex. 17. Sybil Inman was the Personnel Administrator before Iturburo, but she retired from that position around June of 2016. Dkt. 18, App. 0133 at 33–34. However, she continued to work part-time to aid in the transition. *Id.* W.T. Lin was the plant manager, and Iturburo reported to him. Dkt. 18 & App. 225 at 24. Eric Stevenson was the Human Resources Manager at Formosa Plastics, which was a company that acted as a consultant to Nan Ya on human resources issues. Dkt. 18 & App. 221–222 (Stevenson Dep.).

In June 2017, Fillmore reported to Formosa that she was being sexually harassed by her supervisor, Iturburo. Dkt. 17, Ex. 15. Stevenson investigated the report, and Iturburo's employment was terminated less than ten days after the report. Dkt. 17. Fillmore's employment was terminated on July 24, 2017. Dkts. 17, 18. On approximately July 28, 2017, Fillmore filed a charge of discrimination with the Texas Workforce Commission–Civil Rights Division and the Equal Employment Opportunity Commission ("EEOC"). Dkt. 1. She received a right-to-sue letter from the EEOC on February 7, 2018. *Id.* On April 3, 2018, Fillmore filed this complaint against Nan Ya for violating the Texas Commission on Human Rights Act (Texas Labor Code Ann. §§ 21.011 *et seq.*) and Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e *et seq.*), alleging sexual harassment in the workplace and retaliation. *Id.*

A.      **The Alleged Harassment**

1.      **Fillmore Contends That Iturburo Sexually Harrassment.**

Fillmore contends that Iturburo subjected her and other women who worked at the plant to sexual harassment. Dkt. 18. She points to may different instances of harassment and even assault, contending, for example, that Iturburo said things like that he wanted to f*** her and that he wished he could be her cell phone in her back pocket, and that he did things like grab her vagina, breasts, and buttocks. Dkt. 18 (citing Fillmore's deposition). These are just a few of many examples that Fillmore discussed during her deposition. *See id.*

2.      **Fillmore Claims Other Employees Were Subject to or Observed This Behavior**

Fillmore's coworker Salinas testified that Iturburo told her, in more graphic terminology, that "he wanted to stick his face in her private parts"; she also recalled Iturburo saying inappropriate things to Fillmore. Dkt. 18, App. 259–60 (Salinas Dep.). Fillmore contends that the plant manager, Lin, was present when Iturburo made comments in front of employees about Iturburo's penis and

that Lin would laugh.  Dkt. 18, App. 43 at 169 (Fillmore Dep.).  Additionally, on Iturburo's birthday Fillmore claims that Lin witnessed Iturburo telling Fillmore that he did not want any of the birthday cake, but he wanted "'[Fillmore's] cake, white chocolate.'" *Id.* at 166.  Fillmore asserts that she took the comment to be sexual in nature because of the way Iturburo said it.  *Id.* at 167.

### 3.    Fillmore's Issues with Another Coworker

Fillmore also had some issues with her co-worker, Vinay Panchal, who performed payroll for Nan Ya.  Dkt. 18.  Specifically, she observed Panchal looking at prostitute ads on his work computer.  *Id.*  She reported this to Inman on July 18, 2017.  *Id.*; Dkt. 18, App. 217–18 (complaint). She had previously had an issue with Panchal in which he slapped a paper on her desk and began yelling at her.  She contends she reported this incident to Inman, and that Inman just told her that in Panchal's ethnic culture they look down on women and that Fillmore needed to "'be respectful and just relax.'" *Id.* (quoting Fillmore's deposition).  Fillmore states that after this incident she did not feel comfortable reporting any issues she was having to Inman.  *Id.*, Dkt. 18, App. 38–39.

## B.    The Employment Policies

Nan Ya assumes, for the purposes of its summary judgment motion, that Iturburo's conduct constitutes actionable sexual harassment.  Dkt. 17.  It argues, however, that it exercised reasonable care to prevent harassment and that Fillmore unreasonably failed to take advantage of the protective or corrective opportunities it provided.  *Id.*  Specifically, Nan Ya maintained multiple policies that prohibited sexual harassment.  Fillmore acknowledged receipt of these policies when she was hired, and both Lin and Iturburo were trained on the policies.  Dkt. 17, Exs. 6, 7, 27, 29, 31.

Nan Ya's Employee Complaint Procedure states that if an employee believes she has been aggrieved, she should present and discuss the grievance with her immediate supervisor.  Dkt. 17, Ex. 3.  It then sets forth a procedure for resolving the complaint.  *Id.*  The document specifically

3

states that if the "nature of the complaint, problem or dispute involves or has been caused by the employee's superior and the employee has reason to believe his [or her] supervisor may be less than impartial, then the aggrieved employee will issue the complaint to the next level of management as indicated in this policy." *Id.*

Nan Ya's Equal Employment Opportunity Statement and Sexual Harassment Policies also provides procedures for complaints. Dkt. 17, Ex. 4. Under the Sexual Harassment Policy, any "employee who feels that he or she is experiencing harassment on the job because of his or her sex or who feels that he or she is experiencing sex discrimination in any terms or conditions of employment" . . . "should immediately report the matter directly to his or her supervisor by filling out the Fact Finding Form . . . ." Dkt. 17, Ex. 4. The policy specifically notes that if the "fact involved the immediate supervisor, the employee will report the matter directly to the local Personnel Department." *Id.* It then discusses how the local Personnel Manager will investigate. *Id.* It states that if the employee is dissatisfied he or she "has the privilege to request that the complaint be reviewed by [Formosa's] Personnel Director." *Id.*

Nan Ya also had a Business Ethics Guideline, Code of Business Conduct. Dkt. 17, Ex. 5. The first page of this policy provides a toll-free hotline for employees to call to report a concern about noncompliance with Nan Ya's policies and procedures. *Id.* It states that all "reports are handled confidentially and, if you wish, anonymously." *Id.* There is an equal employment policy and a no harassment policy incorporated into the Business Ethics Guideline, Code of Business Conduct. *See id.*

Filmore contends that notwithstanding the formal policies, it is obvious that the policies were not effective and the training was "a joke." Dkt. 18. She points out that Iturburo was responsible for training employees about sexual harassment during the new-hire orientation, and he would often

make racial and sexually charged jokes during these orientations.  *Id.*  Moreover, Filmore argues that "[d]espite numerous employees witnessing sexual harassment or being subjected to sexual harassment, no one reported these issues to anyone outside of Nan Ya, which is a key indicator that Nan Ya's policy was not effective at all."  *Id.*  As far as reasonably reporting, Fillmore asserts that she could not report to Iturburo, did not trust Inman, and did not know who to report to at Formosa. Dkt. 18.

## C.    Fillmore's Termination

Fillmore contends that her termination was in retaliation for complaining about sexual harassment.  Dkt. 18.  Nan Ya argues that it had three legitimate nondiscriminatory reasons for terminating Fillmore's employment.  Dkt. 17.  First, it contends that in July 2017 two different employees reported that Fillmore and her boyfriend, who as also a Nan Ya employee, divulged Inman's salary information.  *Id.* & Ex. 2 at 128–32.  Second, there was an article in a local newspaper that reported that Fillmore had been arrested for identity theft, which was a concern because Fillmore had access to employees' personal information in connection with her job in the personnel department.[1]  Dkt. 17 & Ex. 2 (Inman Dep.) at 132–33, Ex. 7 (Fillmore Dep.) at 234, Ex. 19 (newspaper article).  Third, Nan Ya discovered that Fillmore had three felony convictions and five misdemeanor thefts that she had not disclosed on her job application or, according to Nan Ya, when she had been previously suspended for an undisclosed felony theft conviction from 2008. Dkt. 17 & Ex. 7 at 46–52, Ex. 20.  Nan Ya contends that after receiving this information, Inman and Stevenson both determined that Nan Ya could no longer employ Fillmore.  Dkt. 17, Exs. 1 at 97, 116–17, Ex. 2 at 140–43.

---

[1] Fillmore agreed during her deposition that she was arrested for identity theft but points out that the charges were later dismissed.  Dkt. 17, Ex. 7 at 234.

5

Fillmore asserts that the real reason her employment was terminated was because she filed the complaint and that the "incredibly suspicious timing" coupled with flaws in Nan Ya's other reasons is evidence of pretext. Dkt. 18. She contends that she reported her previous convictions to Inman and Iturburo in January 2017 when she was originally suspended for not disclosing a felony conviction and that she should not have been fired for being arrested because the company policies state that conviction or confession of a felony is prohibited, not being arrested for a felony. *Id.* Additionally, she denies that she shared Inman's pay information with anyone and suggests that perhaps Panchal, who worked in payroll, disclosed it. *Id.*

**D.      The Motion for Summary Judgment**

Nan Ya has moved for summary judgment on both of Fillmore's claims, arguing that (1) it is not liable for the alleged sexual harassment because it can prove its affirmative defense related to having a policy against harassment and Fillmore unreasonably failing to take advantage of the policy; and (2) it is not liable for retaliation because it had three legitimate nondiscriminatory reasons for terminating Fillmore's employment. Dkt. 17. Fillmore argues that Nan Ya's defense fails because the policies were ineffective and she reported the harassment as soon as she was able to determine where to report. Dkt. 18. As far as retaliation, Fillmore contends that each of the purported reasons are pretext. *Id.*

## II. LEGAL STANDARDS

Fillmore brings her claims under both Title VII and the Texas Commission on Human Rights Act ("TCHRA"). Dkt. 1. [T]he law governing claims under the TCHRA and Title VII is identical." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999); *see City of Waco v. Lopez*, 259 S.W.3d 147, 151 n.3 (Tex. 2008) (recognizing the *Ellerth* defense); *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 764 (Tex. 2018) (using the *McDonnell Douglas* burden-

6

shifting framework for a retaliation claim with circumstantial evidence).  The court will therefore

rely on cases applying Title VII to analyze Fillmore's federal law and state-law claims.

**A.**     ***Faragher/Ellerth* Defense**

In *Burlington Industries, Inc. v. Ellerth*, Kimberley Ellerth was subjected to "boorish and

offensive remarks and gestures" by her supervisor.  524 U.S. 742, 747, 118 S. Ct. 2257 (1998).  She

eventually quit her job, and she informed her employer three weeks later that she quit because of the

supervisor's behavior.  *Id.* at 748.  She did not inform anyone with authority at work about the

behavior even though she knew the company had a policy against sexual harassment.  *Id.*  She sued,

and the case reached the U.S. Supreme Court.  *Id.* at 754.  The Court considered the impact of

agency principles on employer liability for sexual harassment.  *Id.* at 754–63.  The Court pointed

out that "Title VII is designed to encourage the creation of antiharassment policies and effective

grievance mechanisms" and if "employer liability [were] to depend in part of an employer's effort

to create such procedures, it would effect Congress' intention to promote conciliation rather than

litigation in the Title VII context."  *Id.* at 764.  It additionally pointed out that to "the extent limiting

employer liability would encourage employees to report harassing conduct before it becomes severe

or pervasive, it would also serve Title VII's deterrent purpose."  *Id.*

The Court held that an "employer is subject to vicarious liability to a victimized employee

for an actionable hostile environment created by a supervisor with immediate (or successively

higher) authority over the employee.  When no tangible employment action is taken, a defending

employer may raise an affirmative defense to liability or damages, subject to proof by a

preponderance of the evidence . . . . The defense comprises of two necessary elements: (a) that the

employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior,

and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or

7

corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 765.  The Court noted that proof of an antiharassment policy with a complaint procedure is not always necessary, "the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense." *Id.*  Additionally, a demonstration of failure by the employee to use the complaint procedure "will normally suffice to satisfy the employer's burden under the second element of the defense." *Id.*  The affirmative defense is not available when the harassment culminates in a tangible employment action.  *Id.*  The Court held that the employer could be vicariously liable under this test and that it should have the opportunity to assert and prove the affirmative defense, and it remanded the case to allow the district court.  *Id.* at 766; *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275 (1998) (issued on the same day as *Ellerth*, setting forth the same affirmative defense but finding that in *Faragher* the employer failed to disseminate its policy and made no attempt to keep track of supervisors and thus could not have been found to exercise reasonable care to prevent the harassing conduct).

The employer bears the burden of proof by a preponderance of evidence on both elements of the *Ellerth/Faragher* defense.  *See, e.g.*, *EEOC v. Boh Bros. Constr. Co., L.L.C.*, 731 F.3d 444, 462 (5th Cir. 2013).  "An employer can satisfy the first prong . . . by implementing suitable policies and educational programs regarding sexual harassment."  *Id.* at 462–63.  "Not every policy eliminates liability; generic policies that offer no specific complaint procedure may be insufficient to satisfy the *Ellerth/Faragher* defense."  *Id.*  With regard to the second prong, an "employee cannot defeat the *Ellerth/Faragher* affirmative defense by choosing to ignore his [or her] employer's well-communicated policies."  *Id.* at 464 n.21.  But it is also not reasonable to expect an employee to report under a policy that offers no specific instructions on how to assert harassment complaints. *Id.* at 464.

**B.      Retaliation**

In a retaliation case, a plaintiff "must show that (1) he [or she] engaged in conduct protected by Title VII; (2) he [or she] suffered a materially adverse action; and (3) a causal connection exists between the protected activity and the adverse action." *Jenkins v. City of San Antonio Fire Dep't*, 784 F.3d 263, 269 (5th Cir. 2015).  If the plaintiff meets this requirement, the burden shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the adverse employment action. *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).  The plaintiff then assumes the burden to present proof that the employer's stated reason is pretextual.  *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).  Under this framework, the employee's ultimate burden is to prove that the adverse employment action taken against the employee would not have occurred "but for" the protected conduct.  *Pineda*, 360 F.3d at 487.  In other words, "even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct."  *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir.1996).   An employee's subjective belief that an employer's decision is motivated by discrimination is not sufficient evidence of pretext.  *Septimus v. Univ. of Hous.*, 399 F.3d 601, 610 (5th Cir. 2005).

An employee engages in protected activity if she "oppose[s] any practice made an unlawful employment practice" under Title VII.  42 U.S.C. § 2000e–3(a).  "For an employer's act to qualify as a materially adverse action, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Cabral v. Brennan*, 853 F.3d 763, 767 (5th Cir. 2017) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53,

68, 126 S.Ct. 2405 (2006) (citation and internal quotation marks omitted)).  As far as causation, "[t]emporal proximity alone is insufficient to prove but for causation."  *Strong v. Univ. Healthcare Sys. L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007).  "[T]o be persuasive evidence, temporal proximity must be very close, and importantly . . . temporal proximity alone, when very close, can in some instances establish a *prima facie* case of retaliation; . . . [however,] temporal proximity standing alone can[not] be sufficient proof of but for causation."  *Id.*

## III. ANALYSIS

The court will first consider whether Nan Ya has shown by a preponderance of the evidence that it should prevail on its *Ellerth/Faragher* affirmative defense to Fillmore' sexual harassment claim, and it will then turn to the burden shifting framework in its analysis of Fillmore's retaliation claim.

### A.    *Ellerth/Faragher Defense*

### 1.    Did Nan Ya exercise reasonable care to prevent and correct promptly any sexually harassing behavior?

First, the court must examine whether the policies and training Nan Ya provided are sufficient evidence of reasonable care to prevent sexual harassment and then determine whether the investigation and termination of Fillmore's supervisor was sufficiently prompt and effective.  Nan Ya contends that its policies were explicit and categorical in prohibiting sexual harassment and that they provided specific guidance on how to report sexual harassment.  Dkt. 17.  It asserts that it distributed the policies to all employees and made them aware of the prohibition against sexual harassment and the complaint avenues.  *Id.*  It points out that Iturburo, Inman, and Lin all received training on sexual harassment, and that all three employees received and reviewed the updated Business Ethics Guideline, Code of Business Conduct just before Fillmore began work with Nan Ya.

*Id.*  Fillmore also received copies of the policies during her orientation, and she initialed each page. *Id.*  Additionally, it points out that Fillmore's job duties included training new employees on these and other policies.  *Id.*

Fillmore contends that Nan Ya had actual knowledge of the harassment long before Fillmore reported it to Stevenson at Formosa because Lin, the Plant Manager, witnessed Iturburo make comments about his penis and make sexually explicit jokes, and Lin merely laughed at the inappropriate comments.  Dkt. 18.  Fillmore contends that because Lin did not take any reasonable or adequate steps to prevent the harassment after Lin was on notice, Nan Ya's affirmative defense fails on the first prong.  *Id.*  Fillmore argues that she failed to report to Inman because she was not the head of the personnel department and because such a report would have been futile as Inman had inadequately responded to an earlier complaint by Fillmore that her coworker Panchal was treating Fillmore badly.  *Id.*  With regard to the policies, Fillmore asserts that Nan Ya merely placed a policy in a handbook, which is "empty formalism," and that it did nothing proactive to prevent harassment. *Id.*  She argues that any training Nan Ya provided to Lin and Iturburo was ineffective.  She points out that Iturburo was the individual in charge of training employees on sexual harassment and would often make sexually charged jokes during the orientations he led.  *Id.*  However, nobody reported these issues, "which is a key indicator that Nan Ya's policy was not effective at all."  *Id.*

Nan Ya argues that the *Ellerth/Faragher* defense cannot be defeated simply by pointing out that harassment occurred.  Dkt. 19.  Instead, it argues, the court must consider whether its policies were sufficiently robust.  *Id.*  It contends that there is no evidence that Lin was aware of Iturburo's behavior and that even if Lin did hear the comments, the comments that Fillmore contends Iturburo made in front of Lin are "woefully insufficient to put Lin on notice of any type of harassment."  *Id.*  Additionally, Nan Ya contends that Fillmore's claim that reporting was futile fails as a matter of law

11

because there is no objective basis for Fillmore to believe that Inman would not adequately respond to a sexual harassment complaint simply because Fillmore was dissatisfied with Inman's response to a earlier complaint not relating to sexual harassment and, regardless, the Fifth Circuit has held it is unreasonable not to file a second complaint so long as there are multiple avenues for such a complaint. *Id.*; *see Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 165 (5th Cir. 2007) ("In most cases, as here, once an employee knows his initial complaint is ineffective, it is unreasonable for him not to file a second complaint, so long as the employer has provided multiple avenues for such a complaint.").

### a.    Potentially Reporting to Lin Under the Complaint Procedure

Nan Ya's Complaint Procedure required Fillmore to report to "the next level of management" if her superior was a problem or the employee believed the superior would not be impartial. Dkt. 17, Ex. 3. Fillmore obviously could not report to Iturburo because he was the alleged harasser. She contends she did not believe Inman would be impartial. The next level after Inman was Lin, the plant manager. Filmore argues that Lin knew about Iturburo's behavior already and did nothing. Fillmore testified during her deposition that Iturburo "would just make comments, not directly towards someone but in the presence of everyone. Derogatory racial, sexual. . . . There's many different things that he would do, and he would do it in the presence of W.T. [Lin], other supervisors. He's not – he – he – W.T. is not the only one. There's a lot of them." Dkt. 18, Ex. 1 at 163. Additionally, she claims that Lin witnessed an inappropriate comment on Iturburo's birthday. Fillmore asked Iturburo if he got any cake, and Iturburo allegedly said, "'I don't want any of' – 'of that cake, I you [sic.] want your cake, white chocolate.'" *Id.* at 165–66. Fillmore contends that "they both [(Lin and Iturburo)] just giggled." *Id.* at 166. Fillmore states that she "took [the comment] as a very sexual nature, the way it was said to [her]." *Id.* at 167. Fillmore also testified

12

that Lin and Iturburo would talk in the hallway and when people made comments Iturburo said, "'In my dick'" or "'With my dick'"—in front of Lin. *Id.* at 168–69. She contends that he made this type of comment relating to his anatomy "several times" in or around Lin and "they would just giggle and laugh it off, all of them." *Id.* at 169.

Nan Ya argues that Lin did not have actual knowledge of the alleged harassment. Dkt. 19. First, it points to Lin's declaration, in which Lin states that Fillmore did not complain to him and he "never observed Mr. Iturburo physically or verbally harass Ms. Fillmore." Dkt. 17, Ex. 32. Lin contends that he does not recall any incident relating to the phrase "white chocolate" and "certainly would not have recognized the phrase as sexual had I heard it as Ms. Fillmore alleges." *Id.* He also denies that Iturburo "made any sexual, inappropriate, or unprofessional comments" and that if he had heard Iturburo doing so, he "would have corrected him or seen to it that he was issued appropriate discipline." *Id.*

"An employer may be liable for sexual harassment if it 'knew or should have known of the harassment in question and failed to take prompt remedial action.'" *Sharp v. City of Hous.*, 164 F.3d 923, 929 (5th Cir. 1999) (quoting *Williamson v. City of Hous.*, 148 F.3d 462, 464 (5th Cir. 1998)). "This standard was not disturbed by *Faragher* or [*Ellerth*]." *Id.* "A [T]itle VII employer has actual knowledge of harassment that is known to 'higher management' or to someone who has the power to take action to remedy the problem." *Id.* "There is no actual knowledge until someone 'with authority to address the problem' is notified." *Id.* (quoting *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 404 (5th Cir. 1993)). Here, it is clear that Lin had authority to discipline or terminate Iturburo's employment. The question then is whether there is an issue of material fact that he had actual notice.

While Fillmore contends that the way Ituburo said "white chocolate" was clearly sexual and

that he frequently used the term "my dick" in front of Lin, there is no indication that Lin was aware, with the exception of the white chocolate comment, that Fillmore even heard the comments.  This one stray comment that could possibly be perceived as sexual given a specific intonation is hardly "severe or pervasive [enough] to alter the condition of the victim's employment and create an abusive work environment."  *Harris v. Forklift Sys.*, 510 U.S. 17, 21, 114 S. Ct. 367 (1993); *see Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328–29 (5th Cir. 2004) (finding that the following behavior was "boorish and offensive" but not severe: (1) remarking about another employee's body; (2) slapping the plaintiff on the behind with a newspaper; (3) grabbing or brushing against the plaintiff's breasts and behind; (4) holding the plaintiff's cheeks and trying to kiss her; (5) asking the plaintiff to come into the office early so that they could be alone; and (6) standing in the door of the restroom while the plaintiff was trying to wash her hands); *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 872, 874–75 (5th Cir. 1999) (finding that the alleged harasser's conduct "although offensive, was not the type of extreme conduct that would prevent [the plaintiff] from succeeding in the workplace" when the conduct included (1) remarking that the plaintiff's "'elbows are the same color as [her] nipples"; and (2) telling the plaintiff that she had "'big thighs'" while simulating looking under her dress; (3) standing over the plaintiff's desk and looking down her clothing; (4) touching the plaintiff on her arm, rubbing his hands on her shoulder down to her wrist; and (5) patting his lap and telling the plaintiff "'here's your seat'").  In fact, the comment about white chocolate combined with the alleged comments about Iturburo's penis does not rise to the level of severe given Fifth Circuit precedent on conduct that is severe enough to give Lin notice of a hostile work environment.  *See, e.g.*, *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996) (finding that there was "substantial evidence from which the jury could have concluded that [the harasser's] comments and questions were sufficiently severe and pervasive as

14

to alter the condition of [the plaintiff's] employment" when the harasser "inquired about [the plaintiff's] sexual activity or made comments similarly offensive two or three times a week" and "made many egregious comments to [the plaintiff], some in front of co-workers, that in combination with the frequent inquisition about her sexual activity were sufficiently severe and pervasive to create a hostile work environment"); *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 478 (5th Cir. 1989) (finding that the plaintiff raised an issue of material fact as to a hostile work environment when "several different employees touched [the plaintiff] in a sexual manner and directed sexual comments toward her," there was "ongoing sexual graffiti on the walls . . . and in the elevator and bathroom").   The court thus finds that even though the evidence, construing it in the light most favorable to Fillmore, indicates that Lin heard the comment about white chocolate and heard Iturburo discuss his penis on more than one occasion, this conduct was not severe enough such that Lin should have known that Fillmore was enduring a hostile work environment.   Thus, Lin's alleged knowledge of inappropriate behavior did not relieve Fillmore of the need to report it under Nan Ya's reporting procedures.

### b.   Potentially Reporting to Formosa Plastics or Using the Hotline

Moreover, even if Fillmore believed it was futile to report to Lin, Nan Ya's policies reasonably provided other means to report the behavior.   Fillmore agrees that the equal opportunity and sexual harassment policies required her to complain to her supervisor, the local personnel department, or the corporate personnel director of Formosa Plastics.   Dkt. 18.   She argues that she did not report to Inman because she did not trust her after she failed to take action against Panchal.   Dkt. 18 & App. 0038 (Fillmore Dep.) at 153 (stating that she did not believe she could confide in Inman).   She claimed during her deposition that Iturburo was her supervisor *and* the head of the local personnel department and that she did not know who the corporate personnel director was.

15

Dkt. 18 & App. 0024 (Fillmore Dep.) at 89.  She agreed that the Business Ethics Guideline, Code of Business Conduct had a toll-free hotline for reporting concerns, but she testified that she was unaware of the hotline, never reviewed it with any employees when going over the business ethics guidelines, did not remember the number being in the guidelines, and did not remember reading the part about the hotline.  Dkt. 18, App. 0024 (Fillmore Dep.) at 90–92.  However, she agreed that she initialed each page of the policies and that they were available to her during her employment.  *See* Dkt. 18, App. 0023–24 (Fillmore Dep.) at 87–92.

The court finds that Nan Ya exercised reasonable care in preventing and promptly correctly sexual harassment.  While the Equal Employment Opportunity Statement and Sexual Harassment Policies may have been deficient in not advising who to report to or how to make a report to Formosa Plastics, when you combine these policies with the ethics policy, which provides a hotline, and consider that Nan Ya trained Lin, Inman, and Iturburo on these policies, and that Fillmore had to initial each page of the policies when she was hired, Nan Ya has shown by a preponderance of evidence that it exercised reasonable care in preventing sexual harassment.  The fact that Fillmore was unaware of these procedures even though she initialed the pages and worked for the human resources department is not evidence that *Nan Ya* did not exercise reasonable care.  There is no dispute that when Fillmore found the information needed to report to someone other than Iturburo, Inman, or Lin and contacted Formosa, Nan Ya took prompt action, investigated the complaint, and terminated Iturburo's employment within ten days of Fillmore's complaint.

### c.     Was the policy ineffective?

Fillmore argues that even though Nan Ya had policies and provided training, it "is obvious that neither the policies nor this alleged training was effective at preventing and correcting sexual harassment in the workplace."  Dkt. 18.  She points out that Iturburo was responsible for training

and that this training was "a joke," as Iturburo "would often make racial and sexually charged jokes during the orientations in which he led." *Id.* As evidence that the policies were ineffective, she argues that (1) nobody reported the issues; and (2) Nan Ya did not institute the changes Stevenson suggested, including inhibiting people from viewing pornography after she reported that Panchal had been looking at a prostitute advertisement on his computer and they subsequently found pornography on his computer. *Id.* (citing Dkt. 18, App. 0153 (Inman Dep.) at 114; Dkt. 18, App. 0286 (Panchal Dep.) at 8–11, 28–29, 31–32)

Nan Ya argues that its *Faragher/Ellerth* defense cannot be defeated simply because harassment occurred as such a rule would negate the purpose of the rule. Dkt. 19. It contends that the proper question is whether the policies were robust enough to meet the defense standards, and they were. *Id.* It asserts that, with regard to Fillmore's arguments about Panchal, that it investigated the accusations but could find no evidence that Panchal actually viewed pornography, and that Inman spoke to Panchal about the issue and Stevenson counseled him about how it was inappropriate in the workplace. *Id.* (citing Dkt. 17, Ex. 2 (Inman Dep.) at 107–08, 126; Dkt. 17, Ex. 35 (Panchal Dep.) at 48–49; Ekt. 17, Ex. 1 (Stevenson Dep.) at 87; Dkt. 17, Ex. 33 (Bartash email)).


Stevenson testified that he spoke to Panchal about the allegations, and Panchal denied looking at pornography on his computer. Dkt. 17, Ex. 1 at 87. Stevenson stated that there was "no recent activity" found on Panchal's computer and that they could not confirm that the images were Panchal's because the computer was very old. *Id.* at 85–86. Regardless, he recommended that Inman discipline Panchal. *Id.* at 88.

Inman testified that she had Nan Ya's "IT guy pull up the usage on [Panchal's] computer" after Fillmore complained and "what he found was that there was nothing – nothing recent. There

was something over two years old that . . . popped up out of something else." Dkt. 17, Ex. 2 at 108.

Inman said that she spoke to Panchal about it and Panchal advised that "this stuff would just pop up

on his computer" and he had talked to the "IT guy" about "how he could get rid of it." *Id.*  With

regard to Stevenson's recommendation that she address the situation, Inman indicated that she spoke

to "someone in New Jersey" about coming to do additional training, but she did not recall if it had

happened by the time she left Nan Ya in 2018.  Dkt. 18, App. 0153 at 114.

Lawrence Bartash, the "IT guy," stated in an email to Inman that there were graphic files on

Panchal's computer and the file dates "are from years ago."  Dkt. 17, Ex. 33.  Bartash advised that

Panchal did not download the material recently and that Bartash left the originals in Panchal's

folders.  *Id.*

Panchal testified that he did not intentionally look at inappropriate material on his computer

and that he was having issues with pop-ups and knew that viewing explicit material on his company

computer was against company policy.  Dkt. 17, Ex. 35 at 48–49.  He noted that Stevenson had

informed him that Fillmore complained about seeing inappropriate images on Panchal's computer,

and Panchal reported that he told Stevenson that his computer did not have a pop-up blocker and

images of "half-naked women" popped up when he was looking through backpage.com for

apartments and restaurants.  Dkt. 18, App. 0308–09.  Panchal testified that he asked Bartash to fix

the pop ups, and he does not receive the pop ups any more.  Dkt. 18, App. 0312.  When asked about

the pornographic images that were found in a folder in his computer, Panchal stated that if he was

not mistaken, the images were still in a folder on his computer, and he did not know how they came

to be on his computer.  Dkt. 18, App. 0313 at 28.  He testified that he has not looked at the photos

on his computer other than to open and close the folder, entitled "Sunny Leon," which Panchal

testified is the name of a "porn actress."  Dkt. 18, App. 0314–15 at 29–30.  Panchal stated that he

had not received a write up or been disciplined for viewing pornography at work.  Dkt. 18, App.

0317 at 32.

The evidence demonstrates that Nan Ya found pornographic images on Panchal's computer

after Fillmore reported viewing the inappropriate advertisement and that there are likely still

pornographic images on Panchal's computer despite Fillmore's report.  However, Fillmore's report

was about the pop-ups, and it appears this issue was fixed right away.  The fact that Nan Ya found

an additional problem and has not corrected it does not demonstrate that its policy was ineffective.

> **2.** **Did Fillmore unreasonably fail to take advantage of preventative or corrective**
> **opportunities provided by Nan Ya or avoid harm otherwise?**

Nan Ya contends that Fillmore unreasonably failed to use the available reporting procedures.

Dkt. 17.  She did not contact Formosa until seven months after she claims the harassment began,

which Nan Ya argues is patently unreasonable under Fifth Circuit precedent as a matter of law.  *Id.*

(citing *Casiano*, 213 F.3d at 287; *Williams*, 376 F.3d at 479; *Thompson v. Naphcare, Inc.*, 117 F.

App'x 317, 324 (5th Cir. 2004); *Wyatt*, 297 F.3d 405, 413 (5th Cir. 2002)).  Additionally, Nan Ya

argues that Inman, not Iturburo, was the Human Resources Manager at Nan Ya for all but a few

weeks of the alleged harassment, and that Fillmore should have reported the behavior to Inman.  *Id.*

Moreover, Nan Ya points out that Fillmore's coworker, Brittney Salinas, encouraged her to report

the matter to Lin or Formosa Plastics' Human Resources Department "a couple of months" before

Fillmore filed the complaint.  *Id.* (citing Dkt. 17, Ex. 16 (Salinas Dec.)).  Nan Ya argues that

Fillmore's personal failure to review or recall the Business Ethics Guideline, Code of Business

Conduct is not sufficient to deprive Nan Ya of its defense.  *Id.*

Fillmore contends that there are factual disputes about who the head of Nan Ya's personnel

department was throughout the time Fillmore was sexually harassed, whether the existence of a

hotline was known to employees, and whether Nan Ya provided Fillmore with appropriate information on who to contact at Formosa to handle her complaint. Dkt. 18. She notes that while Nan Ya contends that Inman was the head of the personnel department and that Fillmore should have reported to her, but Fillmore argues that even Inman's testimony confirms that Iturburo was the head of the personnel department beginning in July 2016. *Id.* Moreover, she argues that she did not trust Inman for reasonable reasons. *Id.* With regard to the hotline, Fillmore contends that the hotline is *not* a reporting procedure outlined in the sexual harassment policy and that (1) she did not know about the hotline; (2) Salinas never mentioned the hotline when asked how to report sexual harassment at Nan Ya; and (3) Inman did not know who answered the hotline and testified that no employee had ever used the hotline. *Id.* Fillmore thus argues that the hotline was not a well communicated policy. *Id.* With regard to reporting to Formosa, Fillmore argues that she did not know who to contact at Formosa until she found papers in the receptionist area as Nan Ya did not communicate who to report to at Formosa. *Id.*

First, who the head of the personnel department was is immaterial. While the sexual harassment policy says the personnel department will handle if the immediate supervisor is the problem, the Complaint Procedure directs employees to the "next level of management," and the Business Ethics Guideline, Code of Business Conduct provides the hotline and outlines a duty to report violations. Fillmore initialed all of these policies, not just the sexual harassment policy. So, even if she believed Iturburo was the head of the head of the personnel department, he was by not means the only person to whom she could report, and neither was Inman.

The next alleged factual dispute is whether the hotline was even known to employees. Fillmore was a human resources professional, and she initialed the policy that says that Nan Ya employees are "expected to understand and comply with Nan Ya Plastics' Business Ethics

Guideline, Code of Business Conduct, as well as those policies, practices, and regulations that affect his or her job, and to report any violation." Dkt. 17, Ex. 5. It instructs employees to ask for guidance "[w]hen in doubt" by talking with the employee's supervisor, the local Human Resources representative, *or contact[ing] Nan Ya Plastics' toll-free hotline*." *Id.* (emphasis added). It instructs that complaints will be handled anonymously if the employee requests. *Id.* It also includes a *duty* to report violations of the Business Ethics Guideline, Code of Business Conduct. *Id.* Fillmore does not provide enough evidence to create an issue of material fact with regard to the hotline, as (1) Fillmore signed the page acknowledging receipt of the policy containing the hotline; (2) the fact that nobody had used the hotline contained in this relatively newly updated policy does not mean it was not known; and (3) the fact that Salinas did not mention the hotline when discussing reporting procedures does not mean she did not know about it. Moreover, there were other ways that Fillmore could and should have reported Iturburo's behavior.

The next alleged issue of material fact is whether Nan Ya provided information to employees about who to contact at Formosa. The sexual harassment policy states that if the employee is dissatisfied with the Nan Ya personnel manager's handling of a complaint, he or she "has the privilege to request that the complaint be reviewed by the Corporate Personnel Director," which is the personnel director at Formosa. Dkt. 17, Ex. 4. Fillmore contends that she did not know who to report to until she found some papers at the receptionist area right before she contacted Formosa. Dkt. 18. Nan Ya asserts that Fillmore routinely contacted Formosa as part of her job duties, and Inman and Panchal both testified that the corporate telephone numbers were included on a list of extensions maintained in the Human Resources office and provided to all of the Human Resources employees. Dkt. 17 & Exs. 1, 2, 11, 35.

On June 14, 2017, Fillmore emailed May Wong at Formosa and said, "Can you tell me who

I can email that is equivalent or higher than the Personnel Administrator for HR there?"  Dkt. 18, App. 0076.  The policy does not direct employees who to report to at Formosa, and even though Fillmore had access to numbers, the evidence demonstrates that she did not know exactly who the policy meant for her to contact.  But Fillmore could have contacted another individual at Formosa (as she eventually did) to get contact information for the correct person at Formosa sooner.  She knew Formosa could take complaints because she initialed the sexual harassment policy, she worked in the Human Resources Department, Salinas encouraged her to contact Formosa, and she contacted Formosa employees as part of her job.  The fact that the policy did not give her a name and phone number does not excuse her failure to timely report the harassment under these circumstances.  She also initialed the page of the Business Ethics Guideline, Code of Business Conduct that contains the hotline, and her contention that she forgot about it, when the policies were available for her review at any time, does not relieve her of her obligation to report.[2]

The court finds that Nan Ya has shown by a preponderance of the evidence that Fillmore unreasonably failed to take advantage of the corrective opportunities provided by Nan Ya and that no reasonable jury could find otherwise.

## B.    Retaliation

Nan Ya assumes for the purposes of its motion for summary judgment only that Fillmore can make out a prima facie case of retaliation and argues that it had three legitimate non-discriminatory reasons for terminating Fillmore's employment: (1) Nan Ya had a reasonable, good faith belief that

---

[2] There is a reporting requirement in the second prong of the *Ellerth/Faragher* defense not only to correct any harassing behavior that is already occurring, but to help prevent harassment other employees may encounter in the future.  Thus, the importance of the second prong cannot be overstated.  Fillmore needed to use the resources she had available to her to report Iturburo's behavior so that (1) she was not subjected to the behavior in the workplace; and (2) other employees, including all the employees who Iturburo trained on the sexual harassment policies, would not be subjected to the behavior.

Fillmore divulged Inmans' confidential wage information to other employees; (2) Fillmore was arrested for identity theft, which implicated and impacted her trustworthiness given her access to employees' sensitive personal information; and (3) Nan Ya determined in good faith that Fillmore had not fully disclosed her criminal history when confronted in January 2017.  Dkt. 17.  Fillmore contends that these reasons are each pretext.  Dkt. 18.  First, she points to the "incredibly suspicious timing"—just weeks after her sexual harassment report.  *Id.*  Then, she argues that she actually disclosed all of her felony convictions in January 2017, that the identity theft arrest is not sufficient reason for termination under Nan Ya's own policies, and that she did not disclose Inman's pay to anyone.  *Id.*  She contends that the evidence she has as to each of these points is sufficient to allow a reasonable juror to conclude that Nan Ya's reasons were not true.  *Id.*

### 1.    Divulging Inman's Wage Information

Nan Ya contends that in July 2017 two different employees reported that Fillmore and her boyfriend, who also worked at Nan Ya, divulged Inman's salary information.  Dkt. 17 (citing Dkt. 17, Ex. 2 (Inman Dep.) at 128–32; Dkt. 17, Ex. 18).  Nan Ya argues that notwithstanding Fillmore's denial, she cannot deny that Nan Ya received at least two reports that Fillmore disclosed the information.  *Id.*  Nan Ya provides emails indicating that two employees reported that Fillmore and her boyfriend were divulging confidential salary information.  *See* Dkt. 17, Ex. 18.  Fillmore denies the allegations that she disclosed Inman's salary information and asserts that Panchal was in charge of payroll and could have been the person who divulged the information.  Dkt. 18.  However, the employees who reported the information specifically stated that *Fillmore* and her boyfriend disclosed the information.  *See* Dkt. 17, Ex. 18 (emails dated July 17, 2017).  Whether Fillmore actually divulged the information is immaterial to the fact that Nan Ya had reports from employees that she did.  The court finds that the reports that Fillmore was divulging confidential salary information provided a legitimate nondiscriminatory reason for termination.  Notwithstanding the

suspicious timing, Fillmore has not shown that there is an issue of material fact that this reason is pretext.

### 2.    Arrest for Identity Theft

Moreover, the arrest for identity theft around the same time is a legitimate nondiscriminatory reason for termination, especially given Fillmore's position, which gave her access to confidential employee information.  Fillmore argues that Nan Ya's policies state that a conviction or confession of a felony is prohibited but that they fail to mention arrests, and she was never convicted of identity theft.  Dkt. 18.  She also conclusorily states in her response (without citing evidence other than her testimony) that "others have been arrested, convicted, and went to jail while working at Nan Ya, but none of them were terminated."  *Id.*

The fact that Nan Ya does not have a specific policy that says that being arrested for identity theft is a problem does not make it any less of a legitimate reason for termination, especially when the employee works in the Human Resources Department and has access to confidential information about other employees.  The legitimacy of this reason for termination is highlighted by the fact that an employee called to report seeing a newspaper article about Fillmore's arrest, and a manager at Nan Ya noted that employees were discussing the arrest and felt that since it involved fraud Fillmore should not have access to their confidential information.  *See* Dkt. 17, Ex. 19 (newspaper article and report forwarded by concerned manager).  Whether Fillmore was ever convicted of identity theft is immaterial to the fact that other employees were concerned about her access to their information, making her continued employment in the Human Resources department untenable.  The court finds this reason is a legitimate nondiscriminatory reason and that Fillmore has not provided evidence that there is an issue of material fact that the reason was pretext.

### 3.    Alleged Failure to Disclose Criminal History

Nan Ya's third reason for Fillmore's termination is that Fillmore failed to disclose three felony convictions and approximately five misdemeanor thefts.  Dkt. 17.  Fillmore did not answer the question about felony convictions on her employment application, and in January 2017 an employee reported to Panchal that Fillmore was a felon convicted of drug and meth offenses.  *Id.* (citing Dkt. 17, Ex. 13).  Panchal forwarded the report to Inman, who questioned Fillmore.  *Id.* Fillmore claimed that the Texas Workforce Commission had told her that she did not have to disclose convictions that were more than seven years old.  *Id.* (citing Dkt. 17, Ex. 2 (Inman Dep.) at 74–85).  Inman suspended Fillmore and told her that her employment would be terminated if she was not forthcoming in the future.  *Id.*  According to Nan Ya, it discovered the additional felony convictions and misdemeanors when it was confirming Fillmore's arrest report in July 2017.  *Id.* Inman and Stevenson determined Nan Ya could no longer employ Fillmore.  *Id.* (citing Dkt. 17, Ex. 2 (Inman Dep.) at 140–43; Dkt. 17, Ex. 1 (Stevenson Dep.) at 97, 116-17).

Fillmore argues that she disclosed all of her felony convictions to Inman and Iturburo in January 2017 when she was suspended.  Dkt. 18.  She argues that Inman did not feel it appropriate to terminate Fillmore's employment at that time and that it is not a legitimate reason to terminate her employment months later and after she made a sexual harassment complaint.  *Id.*

Nan Ya argues that Fillmore cannot merely dispute the alleged misconduct, she has to undermine Nan Ya's good faith belief in its reason for termination (quoting *Jackson v. Cal-W Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010)).  Of course, if Fillmore *did* tell Inman about her entire criminal history in January and Inman did not terminate her employment at that time, the fact that she used this as a reason very shortly after Fillmore complained of sexual harassment would undermine the court's belief that the convictions were the real reason.  However, while the disagreement regarding whether the other arrests were disclosed in January may create an issue of

material fact as to this one reason for Fillmore's termination, Nan Ya still had two other legitimate nondiscriminatory reasons.

### 4.      Other Evidence of Pretext

Fillmore argues that she can demonstrate pretext by either showing that Nan Ya's reasons are false and unworthy of credence or that she can establish retaliation by the "'suspicious timing, ambiguous statements oral and written, behavior toward or comments directed at other employees in protected group, and other bits and pieces from which an inference of [retaliatory] intent might be drawn.'" Dkt. 18 (quoting *Troupe v. May Dep't Stores*, 20 F.3d 734, 736 (7th Cir. 1994)). Fillmore reported Panchal's viewing of the prostitute advertisement to Inman and told her Panchal was making Nan Ya a hostile environment. *Id.* Shortly thereafter, Inman approached Fillmore about disclosing Inman's pay, and she suspended Fillmore pending the investigation. *Id.* Fillmore then reported this suspension, which she considered to be retaliation for reporting Panchal and Iturburo, to Stevenson. *Id.* Fillmore argues that Nan Ya terminated her employment days after she reported Panchal for viewing prostitute advertisements on his computer and days after she complained of retaliation to Stevenson. Dkt. 18. She points out that during the investigation of that complaint, graphic pornography was found on Panchal's work computer, but Nan Ya, despite Stevenson's recommendations to inhibit people from viewing pornography on work computers and to handle the reports that Panchal viewed pornography on a work computer, did nothing. *Id.*

In order to prove pretext, Fillmore must show that there is an issue of material fact that "'but for' the discriminatory purpose [s]he would not have been terminated." *Septimus*, 399 F.3d at 608. While certainly Fillmore's contention and evidence indicating that Panchal was viewing pornography on his work computer and Nan Ya did nothing to correct the situation is troubling, it does not create an issue of material fact that Nan Ya would not have terminated Fillmore's

employment after she was arrested and after other employees reported that she is the person who divulged Inman's salary information if she had not first complained of sexual harassment.

Fillmore has not demonstrated that a reasonable jury could find that Nan Ya's reasons for terminating Fillmore's employment were pretext and the real reason it terminated her employment is that she complained of sexual harassment.  Nan Ya's motion for summary judgment on Fillmore's retaliation claim is therefore GRANTED.

## IV. CONCLUSION

Nan Ya's motion for summary judgment is GRANTED.  Fillmore's claims against Nan Ya are DISMISSED WITH PREJUDICE.  A final judgment will issue concurrently with this memorandum opinion and order.

Signed at Houston, Texas on September 17, 2019.

_____
Gray H. Miller
Senior United States District Judge